George DOEBEREINER, Plaintiff,

v.

SOHIO OIL CO., d/b/a B.P. Oil Co., Gulf Products Division, Defendant.

No. 88–8034–CIV.

United States District Court,
S.D. Florida, N.D.

March 31, 1988.

Richard W. Farrell, Farrell & Barr, Stamford, Conn., for plaintiff.

Eben Crawford, Squire, Sanders & Dempsey, Miami, Fla., for defendant.

### ORDER

GONZALEZ, District Judge.

THIS CAUSE was heard by the court at an evidentiary hearing held March 16 and 17, 1988 on the Motion for Preliminary Injunction of the plaintiff, George Doebereiner. Pursuant to Rule 52(a), Fed.R. Civ.P., the court now enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff George Doebereiner has leased a service station at the intersection of Northlake Boulevard and Interstate 95 (I–95) in Palm Beach Gardens since 1978.

2. On March 25, 1986, plaintiff entered a new lease agreement with defendant Sohio Oil Company, d/b/a Gulf Products Division (GPD), for a three year term from April 1, 1986 through March 31, 1989.

3. On October 30, 1987, plaintiff received a certified check from the defendant advising him that the lease would be terminated, effective January 31, 1988 pursuant to § 102(b)(2)(A) of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* The parties stipulated to continue the franchise pending this hearing.

4. Defendant seeks to terminate the lease agreement on the ground that plaintiff has failed to comply with the hours of operation provision contained therein. The lease requires the station to be open from 6 a.m. to 12 a.m. seven days per week.

5. Mr. Norm Graziani, District Manager of Gulf Products Division, Miami District, testified that the company determines hours of operation by considering several factors, including the location of the station, its proximity to the interstate, the nature of the surrounding area, the volume of traffic near the station and the number of competitors' stations nearby and their hours of operation.

6. Plaintiff's station is located on a busy east-west road and is the first station off the interstate. The portion of I–95 near plaintiff's station had been under construction and did not open to traffic until December 21, 1987.

7. Mr. Graziani testified that the location of plaintiff's station, the impending opening of I–95, plus the hours of operation of competitors' stations, led to the establishment of the hours prescribed in plaintiff's lease.

8. Mr. Graziani also testified that the philosophy of GPD is to serve the motoring public in general and Gulf customers specifically. Maintaining competitive hours is an important element of developing and keeping regular customers. Mr. Graziani testified that a customer who frequently finds his regular gas station closed is likely to take his business to a competitor's station with better hours.

9. Several individuals who operate gas stations under franchise agreements with competitors of GPD testified that their leases require them to open from 6 a.m. until 12 a.m. These dealers all operate stations close to plaintiff's station.

10. Not all dealer-operated Gulf stations in the South Florida area are required to maintain the same hours as plaintiff's station. The evidence established that the various hours of operation at different stations are based on the factors described above.

11. The prior lease agreement between plaintiff and GPD only required plaintiff to open the station between 7 a.m. and 10 p.m. GPD changed the hours provision in the new lease because the portion of I–95 near plaintiff's station was scheduled to open in 1987.

12. The evidence revealed that plaintiff did not comply with the 7 a.m. to 10 p.m. provision of the prior lease. GPD twice sent warning letters to plaintiff, advising him that he was in violation of the lease agreement for failing to remain open between 7 a.m. and 10 p.m.

13. In February 1986, plaintiff received the current lease agreement. Although he expressed dissatisfaction with the hours provision, plaintiff executed and returned the lease on March 26, 1986.

14. Plaintiff contends that he signed the lease after being assured by Mr. Graziani that GPD would review the hours if they were not mutually beneficial. This assurance was made in a letter sent to plaintiff by Mr. Graziani prior to the time plaintiff signed the lease.

15. Between April 1, 1986 and February 2, 1987, plaintiff's station was normally opened weekdays from 7 a.m. to 10 p.m. with shorter hours maintained on weekends.

16. In December 1986, Palm Beach County commenced road construction near plaintiff's station. Plaintiff reduced his hours even more because business had declined as a result of the construction. Mr. Graziani conferred with plaintiff in June 1987 and agreed that plaintiff could close at 10 p.m. until the construction was completed, at which time plaintiff would have to comply with the hours provision in the lease.

17. The road construction was completed in August 1987. Nevertheless, plaintiff continued to close early in violation of the lease agreement.

18. On August 24, 1987, Mr. Graziani sent plaintiff a warning letter which stated that further violations of the hours provision would result in termination of the franchise agreement.

19. Spot checks of plaintiff's station during the week of October 12–18, 1987 showed plaintiff closing at or before 10 p.m. Monday through Saturday and at 8 p.m. on Sunday. This violation led to the franchise termination letter dated October 30, 1987.

20. Plaintiff has maintained the lease hours since December 21, 1987, the day the I–95 link near the station opened.

21. Plaintiff testified that he does not make any profit between the hours of 10 p.m. and 12 a.m. The gross profit after expenditures for gasoline averages $7.00 or $8.00 per night. Plaintiff's wife, who maintains the station's books, testified that the station loses approximately $30.00 per night when it stays open until 12 a.m.

22. Plaintiff's financial statements for January 1986, January 1987 and January 1988 were introduced into evidence. Plaintiff testified to the net income and legal expenses for each of the three months. In January 1986, the net income was $986.00 and legal and financial expenses were $120.00. January 1987 showed a net income of $1,255.00 with legal and financial expenses of $140.00. Plaintiff testified that the legal and financial expenses of those months were representative of the usual amount paid each month.

23. The January 1988 financial statement reflected a negative net income of $7,387.00. However, during that month plaintiff incurred legal and financial expenses of $10,740.00 in connection with the termination of the franchise. Had plaintiff not incurred these legal expenses, his net income for the month would have been over $3,000.00, twice the net income of the previous January.

24. Plaintiff testified that the net income for the station varied from month to month, depending on what purchases were made in a given month. He also attributed the increase in income in January 1988 to a number of new accounts opened with the station and to a rebate check received by the business.

25. Plaintiff also testified that he had, on a number of occasions, requested that GPD provide him with a hi-rise "Gulf" sign, new computerized tanks and a security drawer. GPD has refused to supply the requested items. Plaintiff blames GPD's failure to provide these items and GPD's motive for the termination on GPD's plan to takeover the station now that I–95 is opened. The station is now in a very profitable location.

## CONCLUSIONS OF LAW

26. This court has jurisdiction under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*

27. Plaintiff George Doebereiner has filed suit under 15 U.S.C. § 2805(a), alleging that defendant GPD has improperly and illegally terminated the petroleum franchise agreement between GPD and himself.

28. This motion for preliminary injunction is brought under 15 U.S.C. § 2805(b)(2). In order to prevail, plaintiff must show (1) that the franchise agreement to which he is a party has been terminated, and (2) that there are sufficiently serious questions going to the merits to make such questions a fair ground for litigation. In addition, the court must find that, on balance, the hardships caused to the franchisor by the issuance of the injunction will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were denied. 15 U.S.C. § 2805(b)(2)(A), (B).

29. The parties agree that the franchise agreement between Mr. Doebereiner and GPD has been terminated. The parties also agree that the notice provisions of the Act have been met. The remaining question is whether there are sufficient ques-

tions going to the merits to justify a preliminary injunction. There being no dispute about the termination of the franchise, GPD bears the burden of showing the termination is reasonable under § 2802(b) of the PMPA.

30. Section 2802(b)(2) lists the various grounds for termination of a franchise. Subsection (A) permits termination upon:

[A] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship. . . .

15 U.S.C. § 2802(b)(2)(A). The notice provisions of that section are not in issue here.

31. Plaintiff George Doebereiner does not dispute the fact that he frequently violated the hours provision in the franchise agreement. In fact, plaintiff testified that he has regularly maintained the required hours only since December 21, 1987. Plaintiff *does* contest the reasonableness and materiality of the hours provision in his lease.

32. The courts have consistently upheld the reasonableness of minimum hours requirements contained in franchise agreements covered by the PMPA. *See e.g., Amoco Oil Co. v. Beyer,* No. 83–C–3807 (N.D.Ill. Sept. 21, 1983), CCH Business Franchise Guide ¶ 8062; *Gruber v. Mobil Oil Corp.,* 570 F.Supp. 1088 (E.D.Mich. 1983); *Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477 (M.D.Pa.1981).

33. Whether a provision of a franchise agreement is reasonable under § 2802(b)(2)(A) "is not a wholly objective determination. Rather, the legitimate business judgments of the franchisor are given considerable weight." *Gruber,* 570 F.Supp. at 1093. While the court should determine the reasonableness of the contract itself, "[i]t is sufficient that the policy or contract has a basis in common sense and experience and is not unconscionable." *Id.* at 1094 *quoting Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1222 (7th Cir.1982).

34. The evidence established that all GPD franchise stations in the Miami District are subject to minimum hours requirements. The hours required for a particular station are determined by reference to the location of the station, its proximity to the interstate, the volume of traffic, and the hours maintained by competitors' stations.

35. As Mr. Graziani testified, the hours contained in plaintiff's lease reflect the fact that plaintiff's station is located on a busy road next to an I–95 interchange. Furthermore, neighboring competing stations are required to operate the same hours as plaintiff is, with some stations operating 24 hours per day.

36. The operating hours required of plaintiff help insure that Gulf customers will not take their business to competing stations as a result of the Gulf station being closed.

37. The court must find that the hours provision in the lease is a result of a legitimate business decision "based on common sense and experience" and is reasonable within the meaning of 15 U.S.C. § 2802(b)(2)(A).

38. Plaintiff contends the hours are not reasonable because he loses $30.00 per night when he is opened after 10 p.m. Although plaintiff has produced evidence that the station realizes no profit between 10 p.m. and 12 a.m. and that those hours are in fact, unprofitable, plaintiff has not shown that the hours provision forces plaintiff to operate at a total loss. In fact, the evidence showed that while operating in accordance with the lease in January 1988, plaintiff would have realized his most profitable January in three years. On these facts, the court concludes that the lease agreement "has a basis in common sense and experience and is not unconscionable." *Gruber,* 570 F.Supp. at 1094.

39. Next, the court must determine the materiality of the hours provision to the franchise agreement. The test for materiality requires the court to determine whether the provision was made in subjective good faith and whether the provision was made in the normal course of business. *Gruber,* 570 F.Supp. at 1093. The court may not "substitute its judgment for decisions derived from ordinary business experience and knowledge." *Id.*

40. The evidence establishes that the hours provision in the franchise agreement is of material significance. GPD has established that it did not arbitrarily impose minimum operating hours on plaintiff. All GPD dealers in the area are subject to minimum hours requirements. The required hours are based upon reasonable business decisions with which this court cannot take issue.

41. Plaintiff argues that the standard for determining reasonableness is one that requires close scrutiny of all the circumstances and that reasonableness is based upon an objective standard of good faith. Plaintiff's argument is based upon two recent cases decided in the Eleventh Circuit and the Third Circuit. However, these two cases involved distinct, separate provisions of the PMPA. In *Slatky v. Amoco Oil Co.*, 830 F.2d 476 (3d Cir.1987), the court applied an objective good faith standard for determining whether the franchisor made a bona fide offer to sell under 15 U.S.C. § 2802(b)(3)(D). The Eleventh Circuit ordered close scrutiny of all circumstances in *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565 (11th Cir.1987). However, *Clinkscales* involved a termination of a franchise agreement under 15 U.S.C. § 2802(b)(2)(C) which allows termination in the event of certain occurrences. Congress set out twelve situations in which such a termination would be reasonable. The Eleventh Circuit simply held that the close scrutiny standard applies where the termination is based upon a ground not specifically set forth in that subsection. Thus, neither *Clinkscales* nor *Slatky* modifies the standard for determining reasonableness and materiality under § 2802(b)(2)(A).

42. Plaintiff contends that GPD is terminating his franchise so that it can open a company-owned station at what has proved to be a very profitable location. GPD's future plans for the station are less relevant to this inquiry than plaintiff would have the court believe.

43. "When termination is predicated on actions by the franchisee," the franchisor's motive for the termination becomes less relevant. *Crown Central*, 515 F.Supp. at 485. As the court there stated,

[t]he franchisee's conduct can be objectively measured against the requirements of 15 U.S.C. § 2802(b)(2). Once a franchisee accepts the legal and contractual obligations of the franchise agreement, he is not free to disregard them. The PMPA does not command or authorize scrutiny of [GPD's] motives in seeking termination for [Doebereiner's] breach of the Agreement.

*Id.*

44. The termination is reasonably based upon Mr. Doebereiner's failure to maintain the reasonable and material hours provisions of his lease. The court having made the findings of fact and conclusions of law set forth above, the court finds that there do not exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation. Accordingly, it is hereby

ORDERED AND ADJUDGED that the Motion for Preliminary Injunction of the plaintiff George Doebereiner be and the same is DENIED.