**George C. DOEBEREINER,**
**Plaintiff–Appellant,**

v.

**SOHIO OIL COMPANY, d/b/a B.P. Oil Company, Gulf Products Division,**
**Defendant–Appellee.**

No. 88–5352.

United States Court of Appeals,
Eleventh Circuit.

Aug. 10, 1989.

Richard B. Warren, Fleming, Haile & Shaw, P.A., North Palm Beach, Fla., Richard W. Farrell, Farrell & Barr, Stamford, Conn., for plaintiff-appellant.

Eben G. Crawford, Squire, Sanders & Dempsey, Miami, Fla., for defendant-appellee.

Before VANCE and COX, Circuit Judges, and DYER, Senior Circuit Judge.

PER CURIAM:

George C. Doebereiner appeals the district court's denial of his request for a preliminary injunction under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. A. §§ 2801–41 (1982). *See Doebereiner v. Sohio Oil Co.*, 683 F.Supp. 791 (S.D.Fla. 1988). We affirm.

## I.

Sohio Oil Company, d/b/a B.P. Oil Company, Gulf Products Division, (Gulf) is a major gasoline distributor selling its products through service stations operated by franchisees. Generally, these stations are owned or leased by Gulf and then leased or subleased to its franchisees. George Doebereiner has leased the service station at the intersection of Northlake Boulevard and Interstate 95 in Palm Beach Gardens, Florida since 1978. On March 25, 1986, he executed a new franchise agreement with Gulf covering the three year period beginning April 1, 1986. This new agreement, unlike its predecessor, contained a clause requiring Doebereiner to operate the station from 6 a.m. to midnight, seven days a week.

Maintaining competitive hours is an important element of Gulf's business philosophy. A Gulf customer who frequently finds his preferred station closed likely will purchase his gasoline elsewhere. Gulf determines the hours of operation for its franchisees by considering, among other factors, the location of the station and the hours of operation of competing stations. Doebereiner's station is located at a busy intersection near I-95; it is the first station off the interstate. Several of his nearby competitors who operate stations under franchise agreements with rivals of Gulf, moreover, are required by their franchisors to remain open from 6 a.m. until midnight. These considerations led Gulf to establish

the hours reflected in Doebereiner's most recent franchise agreement. Not all Gulf franchisees in south Florida are required to maintain these same hours, however. Each station's hours depends on the outcome of the analysis described above.

Doebereiner initially was dissatisfied with the hours provision of the new franchise agreement. He expressed his concerns to Norm Graziani, Gulf's district manager in Miami. In response to Doebereiner's concerns, Graziani wrote a letter assuring Doebereiner that "if after a reasonable period of time a dealer believes that the contractual hours have not proved to be mutually beneficial we are always willing to review these hours for their appropriateness." Thereafter, Doebereiner, his worries apparently abated, acknowledged his agreement with the hours provision by signing the franchise agreement.

Doebereiner admits that he repeatedly violated the hours provision of the franchise agreement. Between April, 1986 and December, 1986, Doebereiner's station normally was opened 7 a.m. to 10 p.m. weekdays, with shorter hours maintained on weekends. Gulf twice sent Doebereiner letters warning him that he was violating the hours provision of the franchise agreement.

In December, 1986, Doebereiner unilaterally reduced the station's hours of operation even more due to a decrease in gasoline sales caused by road construction near the station. Graziani questioned Doebereiner about this reduction in hours and agreed that the station could be closed at 10 p.m. until the construction was completed. Doebereiner was told, however, that thereafter he would have to comply with the hours provision of the franchise agreement.

Construction was completed in August, 1987. Nevertheless, Doebereiner continued to close the station at 10 p.m. Via a letter dated August 24, 1987, Graziani warned Doebereiner that further violations of the hours provision would result in termination of the franchise agreement.

These warnings apparently went unheeded. A Gulf investigation revealed that Doebereiner's station was closed no later than 10 p.m. every night during the week beginning October 12, 1987. These failures to comply with the hours provision prompted Graziani to terminate the franchise agreement. On October 30, 1987, Doebereiner was notified that the franchise was terminated pursuant to the Petroleum Marketing Practices Act, § 102(b)(2)(A), 15 U.S.C.A. § 2802(b)(2)(A). He thereafter filed this lawsuit alleging that Gulf had violated the PMPA by illegally terminating the franchise agreement.

Doebereiner objects to the hours provision of the franchise agreement primarily because it is unprofitable to operate the station between 10 p.m. and midnight. Doebereiner's wife, who maintains the station's financial records, testified at the preliminary injunction hearing that the station loses approximately $30 per night when it stays open after 10 p.m. Security concerns, moreover, were a motivation for Doebereiner's failure to comply with the franchise agreement. Though he requested computerized tanks and a security drawer, Gulf has not supplied that equipment. Doebereiner believes that Gulf is insisting on compliance with the hours provision and refusing to supply equipment that would increase security so that it can oust him and shift to direct management.

## II.

The legislative history of the PMPA reveals that the Act was designed to protect franchisees from arbitrary or discriminatory termination or nonrenewal. S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 874 (*Senate Report*). Congress sought to equalize the obvious disparity in bargaining power between major oil companies and service station operators. *Senate Report* at 875–77.[1] It recognized, however, that

1. The legislative history reflects Congress' concern:

> Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the fran-

franchisors have a legitimate need to terminate or refuse to renew a franchise for violations of the franchise agreement which undermine the entire relationship. *Senate Report* at 876.[2] To attain these often conflicting goals, Congress specifically set forth the permissible grounds for termination or nonrenewal of franchise relationships, and bestowed on federal courts jurisdiction to remedy violations of the Act.

Section 2802(b)(1)(B)[3] provides that a termination must be based on one of the grounds set forth in § 2802(b)(2). Thus, a franchise may be terminated after proper notice[4] for, *inter alia*, "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship...." 15 U.S.C. § 2802(b)(2)(A). Doebereiner, relying primarily on a recent decision of the Second Circuit[5] and a *post hoc* statement by the congressional committee that recommended passage of the PMPA,[6] argues that the

standard for determining reasonableness and materiality is one that requires close scrutiny of all the circumstances surrounding the failure to comply. Stated otherwise, Doebereiner urges the court to apply an objective standard, determining whether the franchise provision was reasonable at the time of the failure to comply from the perspective of a disinterested observer. *See Darling*, 864 F.2d at 989. Gulf, on the other hand, like the court below, insists that whether a franchise provision is reasonable and material under § 2802(b)(2)(A) is not a wholly objective determination. *See Doebereiner*, 683 F.Supp. at 794.

### III.

The PMPA provides that a franchisee may bring an action to prevent termination of the franchise if the franchisor has failed to comply with the requirements of § 2802(b)(2)(A). 15 U.S.C.A. § 2805(a). In any such action, the franchisee may obtain preliminary injunctive relief if he

chisor and the franchisee. This disparity results in franchise agreements which some franchisees have argued amount to contracts of adhesion. The provisions of the contracts between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity of bargaining power into continuing vulnerability of the franchise to the demands and actions of the franchisor. *Senate Report* at 876.

2. The Senate Report provides:
While a franchisor is entitled to reasonable expectations of compliance by the franchisee with the provisions of the franchise agreement, the propriety of resort to termination of the franchise for the most technical or minor violations of the contract must be questioned. Termination is an extreme remedy. It is fundamentally punitive and not compensatory in nature, i.e., the franchisor is not compensated for any financial injury experienced by reason of the franchisee's contractual violations. Instead the franchisee is punished through contract termination. On the other hand, franchise termination may be appropriate as a remedy for franchise misconduct in some cases. Some contractual violations, although not readily reducible to a dollar value, may be so serious as to undermine the entire relationship. In such cases, termination may be the only means available to the franchisor to assure against further violations in the future. Thus the remedy may be particularly appro-

priate where a course of conduct is involved and the need is thereby demonstrated to protect against further injury resulting from the likelihood of a repeated violation in the future.
*Senate Report* at 876.

3. Section 2802(b)(1) provides in relevant part: "Any franchisor may terminate any franchise ... if—(A) the notification requirements of section 2804 of this title are met; and (B) such termination is based upon a ground described in paragraph (2)." 15 U.S.C.A. § 2802(b)(1).

4. The parties agree that timely, legally sufficient notice of termination was given to Doebereiner by Gulf.

5. *Darling v. Mobil Oil Corp.*, 864 F.2d 981 (2d Cir.1989).

6. The principal sponsor of the PMPA recently proposed amendments in response to judicial interpretations that are allegedly at odds with the language and purposes of the PMPA. In a committee report submitted to the entire House of Representatives, it was stated: "In some cases, courts have refused to apply an objective standard ... when the plain language of PMPA requires an objective standard." H.R.Rep. No. 1100, 100th Cong., 2d Sess. at 5 (1988). This *post hoc* statement of the Committee on Energy and Commerce is not entitled to much weight. *See Weinberger v. Rossi*, 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982).

shows that "the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C.A. § 2805(b)(2)(A). The court, moreover, must determine that "the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C.A. § 2805(b)(2)(B). If the franchisee meets his burden, and his hardships, on balance, are greater, then the mandatory language of the statute requires that the court grant preliminary relief. *See* 15 U.S.C.A. § 2805(b)(2).

The PMPA thus sets a standard for preliminary injunctive relief that is more liberal than that which is generally applied outside the PMPA. *Khorenian v. Union Oil Co.*, 761 F.2d 533, 535 (9th Cir.1985). In contrast to Rule 65 of the Federal Rules of Civil Procedure, the PMPA does not require the franchisee to make a showing of irreparable harm or that the injunction, if issued, would not be adverse to the public interest. *See id.; Walters v. Chevron U.S.A., Inc.*, 476 F.Supp. 353, 355 (N.D.Ga. 1979), *aff'd*, 615 F.2d 1135 (5th Cir.1980); *Senate Report* at 899. Rather, the franchisee need only show sufficiently serious questions providing a fair ground for litigation. This phrase has been interpreted as a requirement that the franchisee prove "a reasonable chance of success on the merits." *Khorenian*, 761 F.2d at 535; *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir.1984).

### IV.

The issue which we must resolve, broadly stated, is whether the district court erred in denying Doebereiner's request for preliminary injunctive relief. In reviewing

the district court's judgment on this issue, we reverse, as in any preliminary injunction case, only for an abuse of discretion.[7] *See Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1354 (11th Cir.1983). The district court's factual findings stand unless clearly erroneous. *E.g., Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

### V.

In interpreting § 2802(b)(2)(A) and defining the standard that will henceforth govern the determination of the reasonableness and materiality of franchise provisions in this circuit, we are obligated to give heed to the purposes Congress sought to serve by promulgating the statute, *see Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979), and to the realities of the relationship between the parties. The standard, therefore, should provide franchisees with meaningful protection from arbitrary or discriminatory termination or nonrenewal, yet provide franchisors with the latitude necessary to manage their businesses.

### A.

Finding that the provision was based on common sense and experience and was not unconscionable, and that Gulf included the provision in the franchise agreement in subjective good faith and in the normal course of business, the district court concluded that the hours provision was both reasonable and material.[8] *Doebereiner*, 683 F.Supp. at 794–95 (citing *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir. 1982); *Gruber v. Mobil Oil Corp.*, 570 F.Supp. 1088 (E.D.Mich.1983)). As part of its analysis, the court considered Doebereiner's evidence that operation of the station during the hours of 10 p.m. to midnight is unprofitable and unsafe, *id.* at

7. Congress did not set forth within the PMPA a different standard of review, and we perceive no reason for varying from the usual, deferential standard.

8. The district court also recognized that courts have consistently upheld the reasonableness of hours provisions in franchise agreements covered by the PMPA. *Doebereiner*, 683 F.Supp. at 794 (citations omitted).

793–94, and his allegation that Gulf's insistence on strict compliance with the hours provision is a mere subterfuge for its desire to convert the station to a company-operated station, *id.* at 795. This evidence, however, was not compelling enough to convince the district court that serious questions remained regarding Doebereiner's allegations. *Id.*

Doebereiner and Gulf disagree on the legal standard to be applied in determining the reasonableness and materiality of the franchise provision in question. Doebereiner, citing *Darling*, contends that an objective standard is appropriate. *See Darling*, 864 F.2d at 991 ("The allegedly violated provision must be 'reasonable'—meaning objectively reasonable—taking into consideration all the relevant facts and circumstances. That provision must also be 'of material significance to the franchise relationship.'"). Gulf, on the other hand, asserts that the district court applied the correct standard.

### B.

The hours provision of the franchise agreement is clear; the station must operate between 6 a.m. and midnight, seven days a week. Doebereiner neither disputes this interpretation of the hours provision nor the fact that he routinely failed to comply. In the usual, non-PMPA breach of contract case, the court's scrutiny of the contract, under similar circumstances, would be severely limited. The PMPA, however, because it is remedial legislation designed for the protection of franchisees, requires that the court examine the hours provision of this franchise agreement more closely. Thus, in order to prevent Gulf from terminating the franchise for a mere technical or minor violation of the agreement, *see Senate Report* at 876, the provision under consideration must be "both reasonable and of material significance to the franchise relationship," *see* 15 U.S.C.A. § 2802(b)(2)(A).

■ Neither "reasonable" nor "material" is defined in the PMPA or its legislative history. In interpreting this statute, however, we are not left unguided, for it is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, traditional meaning. *See, e.g., Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184–85, 43 L.Ed.2d 469 (1975). We look, therefore, to the common definitions of reasonable and material. Reasonable is defined as that which is not absurd, ridiculous, extreme, or excessive. *Webster's Third New International Dictionary* 1892 (1981). Material means "being of real importance or great consequence." *Id.* at 1392. Incorporating these definitions into § 2802(b)(2)(A), we conclude that Congress intended to permit termination or nonrenewal only when the franchisee's failure to comply involves a franchise provision that is both conscionable—that is, not absurd, ridiculous, extreme, or excessive—and of real importance or great consequence to the franchise relationship. This analysis necessarily involves an examination of the facts and circumstances surrounding the franchisor's inclusion of the provision in the franchise agreement as well as the franchisee's breach of the provision. To be true to the wording of the statute and commonplace definitions of those words, the court should not judge the franchise provision from the perspective of either the franchisor or the franchisee. Instead, the court should determine reasonableness and materiality from the standpoint of a neutral observer. By reviewing the hours provision in the franchise agreement according to this objective standard, the court insures that the franchisee receives the heightened protection Congress intended while providing the franchisor the latitude necessary to exercise its business judgment. The court does not decide what hours the station is to operate; rather, the court, as a neutral third-party, decides whether the hours provision Gulf has included in the franchise agreement is reasonable and material.

■ The district court applied a different legal standard in determining that the hours provision of this franchise agreement is both reasonable and of material significance to the franchise relationship. We

conclude, however, that remand is not necessary because certain findings of fact made by the district court compel the conclusion that the hours provision is reasonable and of material significance to the franchise relationship.

Testimony revealed that all Gulf franchise stations in the Miami district are subject to minimum hours requirements. Each stations' hours are determined by reference to several factors, including the location of the station and the hours maintained by Gulf's competitors. Because Doebereiner's station is located on a busy road adjacent to I-95 and competes with stations that conduct business until midnight and beyond, Gulf determined that it was prudent to require Doebereiner to operate until midnight.

Doebereiner's evidence, which is relevant to the issue, on the other hand, was unconvincing. The station's financial records show, and the district court found, that the first month that Doebereiner complied with the hours provision, a month after the franchise was terminated, was his most profitable January in several years. Doebereiner, moreover, was unable to establish that he complied with the hours provision prior to termination for a period sufficient in length to determine the true profitability of operating those extra hours. The district court did not err by discounting this and the other evidence presented by Doebereiner in support of his contention that serious questions remain about the reasonableness of the hours provision, and his allegation that Gulf's enforcement of the provision was arbitrary and discriminatory.[9]

### VI.

To summarize, we hold that Congress intended that the reasonableness and materiality of franchise provisions be judged in light of the traditional definitions of those words. A termination pursuant to 15 U.S.C.A. § 2802(b)(2)(A) is permissible, absent arbitrariness or discrimination, therefore, only if the provision is objectively reasonable and material to the franchise relationship. Evidence of the effect on the franchisee of compliance with the provision is relevant. Applying this objective standard to the facts developed below, we conclude that Doebereiner failed to show that there exist sufficiently serious questions going to the merits to make the question of the permissibility of Gulf's termination a fair ground for litigation. Rather, the evidence adduced at the preliminary injunction hearing strongly suggests that Gulf was entitled to terminate the franchise under 15 U.S.C.A. § 2802(b)(2)(A).

AFFIRMED.

---

9. Doebereiner alleges, alternatively, that Gulf waived its right to enforce the hours provision of the franchise agreement by engaging in a "pattern of waiver," beginning with the pre-renewal letter from Graziani to Doebereiner promising to review the hours after a trial period, and ending with an August meeting during which Graziani allegedly waived compliance until construction of I-95 was completed. This argument fails on several grounds. First, the letter falls far short of a waiver. For Gulf to say that it will review the hours provision is not to say that it is waiving compliance. Also, the district court apparently rejected Doebereiner's testimony of the date and content of the face-to-face meeting. This has not been shown to be erroneous.