**NSY, INC., Plaintiff,**

v.

**SUNOCO, INC., Defendants.**

**No. Civ.A. 02–2510.**

United States District Court, E.D. Pennsylvania.

Aug. 13, 2002.

Gary A. Krimstock, Fineman & Bach, P.C., Philadelphia, PA, for plaintiff.

A. Christopher Young, Shannon C. Gierasch, Pepper Hamilton, LLP, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

Plaintiff, NSY, Incorporated ("NSY" or "Plaintiff") filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on April 26, 2002, alleging that Defendant, Sunoco, Inc. ("Sunoco" or "Defendant") was attempting to end the franchise agreement between the parties in violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, et. seq. On May 1, 2002, this Court issued a Temporary Restraining Order, which was revised on May 8, 2002. The Court also set a hearing date of June 17, 2002. The hearing in this matter was held on June 17 and June 18, 2002.

As discussed below, the Court finds that Defendant had sufficient grounds for nonrenewal of the franchise agreement and that Plaintiff, therefore, is not entitled to injunctive relief. We now make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

I. *The Agreement*

1. On July 25, 1990, Chhung H. Huynh entered into an APlus Agreement, an APlus Mini Market Premises Lease and a Motor Fuel Supply Agreement (collectively the "Agreement") with Sunoco's predecessor. In the Agreement, Mr. Huynh agreed to lease and operate a Sunoco gas station and an APlus business located at 2601 Penrose Avenue, Philadelphia, Pennsylvania. *See* Def.'s Ex. 1, 2, & 3.

2. Effective February 7, 1996, Plaintiff entered into an Assignment and Assumption of the Agreement from Mr. Huynh. *See* Def.'s Ex. 4.

3. Sunoco has extended the term of the Agreement on several occasions.

4. Among other things, the Agreement provides that Plaintiff must keep daily calculations and records of the physical inventory of the petroleum products and that Plaintiff will reconcile the physical inventory with the book inventory to figure any gains or losses. *See* Section 10 of Lease Agreement, Def.'s Ex. 1 and Section 2.21 of Motor Fuel Supply Agreement, Def.'s Ex. 2.

5. The Agreement further provides that Plaintiff will notify Defendant of any discrepancies, as defined by the Agreement, that appear as a result of the reconciliation process. *Id.*

6. The Agreement between the parties also provides that Plaintiff will pay specific royalty amounts and keep certain records to verify the royalty amounts due and owing. *See* Sections 8 and 16 of APlus Agreement, Def.'s Ex. 4 and Sections 17 and 19(a) of APlus premises lease, Def.'s Ex. 1. These provisions require that, in order to ascertain the amount due by the franchisee to the franchisor under the royalty Agreement, the franchisee "maintain true and accurate business records, reports, accounts, books and data pertaining to the operation of the Store, as more fully described in the Systems Manual." Def.'s Ex. 4 at section 16(A). The Systems Manual requires that the franchisee maintain and retain for three years, among other things, "Cash register 'X' and 'Z' tapes or Shift and Daily Sales Reports" and "Cash register detail journal tapes, including all tapes from additional or temporary registers and any record of a reset to a register by any cash register company service personnel." *See* APlus Franchise Systems Manual at Chapter 3, Section A(2), Def.'s Ex. 3.

## II. *The Fuel Leak*

7. On November 13, 2001, one of Sunoco's environmental contractors discovered an increase in petroleum product in a monitoring well at Plaintiff's location. *See* N.T., 6/17/02 of T. Smith at pp. 204–05.

8. Sunoco initially determined that the leak must have been from the refinery across the street because Plaintiff's inventory control records did not indicate a loss at the site. *Id.* at pp. 205–07.

9. However, on November 29, 2001, the results of a laboratory analysis of the leaked product indicated that it was new 87 octane, which could not have come from the refinery. *Id.* at pp. 207–08.

10. Subsequently, Sunoco performed a more thorough review of NSY's inventory control records and discovered Plaintiff's failure to record the daily inventory reports as required and discovered errors and/or miscalculations that hid the leak and delayed Sunoco's response to cleaning up the leak. *Id.* at pp. 208–210.

11. The source of the leak was found to be in the flex line piping between the underground storage tanks and the dispensers. *Id.* at pp. 210–211.

12. The franchisee's inventory control records are one of the only ways such a leak could have been detected. *Id.* at pp. 199, 203, and 210.

13. To date, Sunoco has recovered approximately 6,000 gallons from the site. *Id.* at p. 211.

## III. *The Royalty Payments and Reports*

14. In May, 2001, Plaintiff met with Sunoco representatives regarding operational and performance issues relating to his franchise location because Plaintiff had requested a contract renewal. *See* N.T., 6/17/02 of M. Burford at pp. 121–23.

15. As a result of this meeting, Defendant gave Plaintiff a "90 Day Action Plan" which included items Plaintiff needed to improve upon. *Id.* at pp. 121–22.

16. An area that needed improvement was Plaintiff's failure to comply with the record keeping requirements set forth in the Agreement. Specifically Plaintiff was not providing the "Z" reports,[1] which document sales and from which the royalty amounts are calculated, as required by the Agreement. *Id.* at pp. 124–26.

17. In early June, 2001, Plaintiff submitted a royalty form to Mark Burford ("Burford"), a Sunoco area manager, which contained a month-to-date Z Report for the month of May, 2001. This report was incomplete because the bottom of the report had been cut off and one of the four categories of store sales, "grocery-non-taxable," contained an unusually large negative dollar amount. *Id.* at pp. 127–29.

18. When questioned about the incomplete report and the large negative entry, Plaintiff responded that the register printer had cut the tape short and that the negative entry must have been a computer error. *Id.* at pp. 129–130.

19. Plaintiff also admitted that he did not keep the daily cash register detail journal tapes as required by the Agreement and from which the missing information could be obtained. *Id.* at p. 131. Burford told Plaintiff to keep the daily cash register detail journal tapes and showed him how to re-run the report in the event of printer failure. *Id.* at p. 132.

20. Sunoco then began investigating Plaintiff's claim that the large negative

---

1. The "Z" report is a monthly summary of store sales which is printed from the cash register computer software program.

dollar entry was caused by a computer error. *Id.* at p. 133.

21. After a review of Plaintiff's computer program, Sunoco determined that the only way, using Plaintiff's register, to end up with a negative entry was to manually input return sales. *See* N.T., 6/18/02, Weagley, pp. 34–37.

22. On July 10, 2001, Plaintiff submitted another royalty form to Burford which contained a month-to-date Z report for June, 2001. Again, the report was incomplete because it was cut off before the summary of store sales for taxable groceries. *Id.* at pp. 139–140

23. When asked about this incomplete Z report, Plaintiff again replied that it was a computer error. However, Plaintiff had not re-run the report and, once again, had not kept the daily cash register detail journal tapes despite being specifically told to the previous month. *Id.* at pp. 140–41.

24. At this point, Sunoco hired Deloitte & Touche to perform an audit of Plaintiff's financial records. Plaintiff was notified of the audit by letter dated July 17, 2001. *Id.* at p. 142; *see also* Def.'s Ex. 25.

25. Deloitte & Touche observed numerous irregularities which are set forth in a letter to Sunoco dated August 9, 2001. *See* Def.'s Ex. 40. These irregularities included the Z reports being hand cut so that certain numbers were not shown, large negative dollar entries for taxable groceries, large amounts of cigarette carton sales, which were exempt from royalty payments, and which far exceeded Plaintiff's documented payments to cigarette suppliers, and incomplete financial records. *Id.*

26. Deloitte & Touche determined that these discrepancies resulted in an underpayment of royalty fees. *Id.*

27. Deloitte & Touche performed a second evaluation of Plaintiff's financial records on October 4 and 5, 2001.

28. On October 10, 2001, Sunoco representatives met with Plaintiff to discuss the Deloitte & Touche findings and to seek an explanation of the discrepancies. *See* N.T., 6/17/02 of M. Burford at pp. 155–56.

29. On December 13, 2001, Defendant submitted formal findings of its investigation to Plaintiff and informed Plaintiff that it had under-reported gross sales and deprived Defendant of $64,000 in royalties due under the Agreement. *See* Def.'s Ex. 63.

30. On January 14, 2002, counsel for Plaintiff responded to Defendant that it refused to pay the royalty amounts requested and that it was impossible for Plaintiff to owe that much in royalty amounts.[2] *See* Def.'s Ex. 70.

## IV. *The Notice of Nonrenewal and the Complaint*

31. On January 30, 2002, Defendant sent Plaintiff a letter by certified mail notifying Plaintiff that Defendant would only extend the Agreement until May 6, 2002, but would not renew the Agreement after May 6, 2002. *See* Def.'s Ex. 73.

## DISCUSSION

### I. *Provisions of the PMPA*

The PMPA was enacted to combat the imbalance in bargaining power that existed between petroleum franchisors and franchisees. *See Sun Refining and Marketing*

---

**2.** Plaintiff's counsel also requested that information reviewed by Deloitte & Touche be provided to Plaintiff. Plaintiff claims he never received such information. However, as was discussed at the hearing in this matter, Defendant's counsel disclosed these documents in the initial disclosures and informed Plaintiff's counsel that the documents were available for inspection. Plaintiff's counsel never inspected the documents.

*Company v. Rago,* 741 F.2d 670, 672 (3d Cir.1984) (quoting S.Rep. No. 731, 95th Cong., 2d Sess. 17, U.S.Code Cong. & Admin.News 1978, pp. 873, 877); *see also Patel v. Sun Company, Inc.,* 63 F.3d 248, 250 (3d Cir.1995). The PMPA attempts to alter this imbalance by 1) regulating the grounds and conditions for which a franchisor may terminate or not renew a franchise and 2) requiring that the franchisee be given adequate notice of the franchisor's intent to terminate the franchise. *See* 15 U.S.C. §§ 2802 and 2805; *see also Rago,* 741 F.2d at 672. The PMPA's "primary goal is to provide protection to franchisees." *Rodgers v. Sun Refining and Marketing Company,* 772 F.2d 1154, 1158 (3d Cir.1985). However, "it also provides for 'the legitimate needs of a franchisor to be able to terminate a franchise ... based upon certain actions of the franchisee, including certain failures to comply with contractual obligations....'" *Id.* (quoting *Rago,* 741 F.2d at 673).

The PMPA gives the franchisee a cause of action against the franchisor for violations of the Act's provisions, including the right to seek a preliminary injunction prior to the expiration of the franchise agreement. *See* 15 U.S.C. § 2805. The standards for obtaining a preliminary injunction under the PMPA are more lenient than the general standards for obtaining injunctive relief. A court must grant a preliminary injunction under the PMPA if:

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2)(A) & (B).

The franchisee has the burden of demonstrating the termination of the franchise or the nonrenewal of the franchise relationship. 15 U.S.C. § 2805(c). The burden then shifts to the franchisor to present evidence to establish that the termination or nonrenewal "was permitted under section 2802(b) or 2803 of this title." *Id.*

Section 2802(b)(2)(A) provides that a franchisor may terminate or not renew a franchise relationship if there is "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship...." The Act does not define "reasonable" or "material significance." However, in interpreting these provisions, other courts have determined that, in keeping with rules of statutory construction, the common ordinary meaning of these terms should apply. For example, in *Doebereiner v. Sohio Oil Co.,* 880 F.2d 329 (11th Cir.1989), the Court applied the ordinary dictionary definition of these terms to determine that "Congress intended to permit termination or nonrenewal only when the franchisee's failure to comply involves a franchise provision that is both conscionable—that is, not absurd, ridiculous, extreme, or excessive—and of real importance or great consequence to the franchise relationship." *Id.* at 334. Similarly, in *Di Napoli v. Exxon Corp.,* the Court determined that "reasonable" and "material[ly] significant" terms of a contract were those that were "vital to the franchise relationship." 549 F.Supp. 449, 452 (D.N.J.1982). Further, in *Brach v. Amoco Oil Co.,* the Court, in determining the meaning of "material significance," stated that "[m]ateriality ... 'is

applied as an objective test of the significance of a fact to the transactions under consideration.'" 677 F.2d 1213, 1222 (7th Cir.1982) (quoting *Casteneda Gonzalez v. I.N.S.*, 564 F.2d 417, 431 (D.C.Cir.1977)). The *Brach* Court further recognized that in setting these requirements, Congress was concerned that "termination or nonrenewal might be based on 'technical or minor violations of the contract.'" *Id.* (quoting S.Rep. No. 950731, 95th Cong., 2d Sess. 15, reprinted in (1978) U.S.Code Cong. & Ad.News 873, 876).

## II. *Sunoco's Nonrenewal of Plaintiff's Franchise Agreement*

In this case, Defendant Sunoco argues that its nonrenewal of the franchise Agreement with Plaintiff was justified under the PMPA because Plaintiff violated specific provisions of the Agreement which were reasonable and of material significance pursuant to 15 U.S.C. § 2802(b)(2)(A). On the notice of nonrenewal dated January 30, 200[2] [3], Sunoco lists six violations of specific provisions in the Agreement which give rise to the nonrenewal.[4] *See* Def.'s Ex. 73, Letter from Sunoco to Michael Veytsman, dated January 30, 2001. Of these six, Sunoco admits that Plaintiff's "fraudulently prepared environmental and royalty reports" are the most serious violations. *See* Def.'s Ex. 73.

### A. *Violations of Inventory Control Records*

The Agreement between the parties provides that Plaintiff will keep daily calculations and records of the physical inventory of the petroleum product and that Plaintiff will reconcile the physical inventory with the book inventory to figure any gains or losses. *See* Section 10 of Lease Agreement, Def.'s Ex. 1 and Section 2.21 of Motor Fuel Supply Agreement, Def.'s Ex. 2. The Agreement further provides that Plaintiff will notify Defendant of any discrepancies, as defined by the Agreement, that appear as a result of the reconciliation process. *Id.*

Defendant presented evidence at the hearing to establish that Plaintiff failed to properly follow these guidelines, which resulted in a delayed detection of a leak. *See* N.T., 6/17/02 of T. Smith, p. 210. The leak ultimately caused a spill of approximately 6,000 gallons, which Defendant is still in the process of cleaning up. *Id.* at pp. 210–11.

The Court finds that the inventory recording and reconciliation process as well as the notification provisions outlined in the Agreement are reasonable and of material significance to the underlying franchise relationship such that a violation of these provisions constitute grounds for nonrenewal pursuant to 15 U.S.C. § 2802(b)(2)(A).

### B. *Violations of Royalty Reporting Procedures*

The Agreement between the parties also provides for specific royalty amounts and record-keeping to verify the royalty amounts due and owing. *See* Sections 8

---

**3.** The letter was improperly dated 2001, but at the hearing of this matter, all parties agreed that the proper date was 2002.

**4.** Sunoco lists the following violations: deliberate falsification of inventory control records; deliberate under-reporting of royalty fees due Sunoco; failure to comply with record-keeping requirements; various violations of Franchisee's operating requirements (un-

authorized brands in cooler, unauthorized cups, adult magazines not covered, unauthorized equipment and failure to wear uniform); false advertising re product pricing or availability (e.g., refused to sell cartons of cigarettes, despite availability and sign advertising price); refusing right of entry to Sunoco representatives. Sunoco also lists the specific provision of the Agreement that is violated by each of the above. *See* Def.'s Ex. 73.

and 16 of APlus Agreement, Def.'s Ex. 4 and Sections 17 and 19(a) of APlus premises lease, Def.'s Ex. 1. These provisions require that, in order to ascertain the amount due by the franchisee to the franchisor under the royalty Agreement, the franchisee "maintain true and accurate business records, reports, accounts, books and data pertaining to the operation of the Store, as more fully described in the Systems Manual." Def.'s Ex. 4 at section 16(A). The Systems Manual requires that the franchisee maintain and retain for three years, among other things, "Cash register 'X' and 'Z' tapes or Shift and Daily Sales Reports" and "Cash register detail journal tapes, including all tapes from additional or temporary registers and any record of a reset to a register by any cash register company service personnel." See APlus Franchise Systems Manual at Chapter 3, Section A(2), Def.'s Ex. 3.

Defendant presented evidence at the hearing of this matter to establish that Plaintiff failed to keep accurate records as required by the Agreement. For example, Plaintiff did not provide the daily Z tapes as required by the Agreement and failed to keep the daily cash register detail journal tapes as required by the Agreement. When Plaintiff was warned of this failure, he began to produce incomplete daily Z tapes but still failed to produce the daily cash register detail journal tapes. Moreover, Defendant demonstrated other discrepancies in the record keeping including large negative entries and disproportionate sales of tobacco products which were not subject to the royalty payments. Defendant presented evidence to demonstrate that the accounting discrepancies and the failure to comply with the record-keeping requirements of the Agreement resulted in inaccurate assessments and payments of royalties.

The Court finds that Plaintiff's explanations of these discrepancies is not credible in the face of the evidence presented by Defendant. The Court further finds that the portions of the Agreement outlining the record keeping required and the data retention policies are reasonable and are materially significant to the relationship of the parties. Thus, a violation of these provisions, particularly in light of the previously discussed environmental violations, provides grounds for nonrenewal pursuant to 15 U.S.C. § 2802(b)(2)(A).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to the PMPA, 15 U.S.C. § 2805.

2. Plaintiff is a franchisee as that term is defined in the PMPA. See 15 U.S.C. § 2801(4).

3. Defendant is a franchisor as that term is defined in the PMPA. See 15 U.S.C. § 2801(3).

4. The Court finds that the terms of the Agreement between the parties relating to inventory control and reconciliation procedures regarding the petroleum product are reasonable and are materially significant pursuant to 15 U.S.C. § 2802(b)(2)(A). The Court further finds that Plaintiff violated these provisions of the Agreement.

5. The Court finds that the terms of the Agreement between the parties relating to royalty payments and the record keeping required to ensure accurate records of royalty payments due and owing are reasonable and are materially significant pursuant to 15 U.S.C. § 2802(b)(2)(A). The Court further finds that Plaintiff violated these provisions.

6. The Court finds that Defendant had sufficient grounds for nonrenewal of Plaintiff's franchise Agreement due to Plaintiff's failure to comply with these reasonable

and materially significant provisions of the Agreement. *See* 15 U.S.C. § 2802(b).

7. Therefore, the Court finds that Plaintiff is not entitled to a preliminary injunction because Plaintiff cannot demonstrate "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." *See* 15 U.S.C. § 2805(b)(2)(A)(ii).

## CONCLUSION

An appropriate Order follows.

## *ORDER*

AND NOW, this 13th day of August, 2002, upon consideration of the Plaintiff's Motion for Preliminary Injunction and Defendant's Response thereto and pursuant to a hearing held before the Court on June 17 and 18, 2002, it is hereby ORDERED that, consistent with the foregoing Findings of Fact and Conclusions of Law, the Motion is DENIED.