**GLENSIDE WEST CORPORATION, Plaintiff,**

**v.**

**EXXON COMPANY, U.S.A., A DIVISION OF EXXON CORPORATION, Defendant.**

**EXXON COMPANY, U.S.A., A DIVISION OF EXXON CORPORATION, Counterclaimant,**

**v.**

**GLENSIDE WEST CORPORATION, Counterdefendant.**

**Civ. A. No. 90–1333 (AJL).**

United States District Court, D. New Jersey.

Feb. 21, 1991.

William M. Boyle, Rinaldo and Rinaldo, Elizabeth, N.J., for plaintiff/counterdefendant.

James Crawford Orr, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., Stuart H. Harris, Howrey & Simon, Washington, D.C., William R. Hurt, Exxon Co., U.S.A., Houston, Tex., for defendant/counterclaimant.

## OPINION

LECHNER, District Judge.

This is a claim brought by plaintiff Glenside West Corporation ("Glenside") against Exxon Company, U.S.A., a Division of Exxon Corporation ("Exxon"), and counterclaims brought by Exxon against Glenside arising out of the decision by Exxon to terminate the retail motor fuel service station franchise of Glenside (Glenside and Exxon are collectively referred to as the "Parties"). Jurisdiction is alleged pursuant to the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. §§ 2801 *et seq.*, and 28 U.S.C. §§ 1331 and 1337.[1]

Exxon moves to dismiss various counts of the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and to strike the affirmative defenses of Glenside to its counterclaims pursuant to Fed.R.Civ.P. 12(f).[2] For the reasons which follow, the motions are granted in part and denied in part.[3]

*Facts* [4]

Glenside, through its president and sole shareholder Robert E. Lee, Jr. ("Lee"), entered into a franchise relationship with Exxon sometime around April 1985 for the operation of an Exxon retail motor fuel service station (the "Service Station") located at 2591 U.S. Route 22, Scotch Plains, New Jersey. Amended Complaint at 5–6. The franchise relationship was based on a lease agreement (the "Lease Agreement") and retail sales agreement (the "Sales Agreement") between the Parties which authorized Glenside to use Exxon's trade mark in connection with the sale, consignment or distribution of motor oil (the "Lease Agreement" and "Sales Agreement" are collectively referred to as the "Franchise Agreement"). Amended Complaint at 6. The Parties renewed the Franchise Agreement on or about 27 September 1987 for the period 1 January 1988 to 1 January 1991. Amended Complaint at 8.

Glenside alleges a number of conflicts arose with Exxon during the course of the franchise relationship. Glenside alleges that while the Franchise Agreement permitted the performance of automotive repair and towing services, agents and employees of Exxon continuously insisted beginning in January 1988 that Glenside abandon its repair and towing services and limit its operations to the sale of motor fuel

---

1. The Amended Complaint specifically alleges jurisdiction and venue pursuant to 15 U.S.C. § 2805. Section 2805 provides in relevant part:

   **Enforcement provisions**

   **Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action**

   (a) If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchisee may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of—

   (1) the date of termination of the franchise or nonrenewal of the franchise relationship; or

   (2) the date the franchisor fails to comply with the requirements of section 2802 or 2803 of this title.

   15 U.S.C. § 2805(a).

2. In support of its motions, Exxon submitted: the Memorandum in Support of Motion of Defendant–Counterclaimant Exxon Company, U.S.A. to Dismiss Certain Claims (the "Motion to Dismiss Brief"); the Memorandum in Support of Motion of Defendant–Counterclaimant Exxon Company U.S.A. to Strike Plaintiff–Counterdefendant's Affirmative Defenses (the "Motion to Strike Brief"); and the Reply Memorandum in Support of Motions of Defendant–Counterclaimant Exxon Company, U.S.A. to Dismiss Certain Claims and Strike Affirmative Defenses (the "Reply").

   In opposition to the motions, Glenside submitted the Brief in Opposition to Defendant–Counterclaimant's Motions to Dismiss Certain Claims and Strike Plaintiff–Counterclaimant's Affirmative Defenses (the "Opposition").

3. In addition, Exxon moves for an order requiring Glenside to vacate the service station premises, and Glenside cross-moves for a preliminary injunction enjoining Exxon from evicting it from the premises. Because these matters were not submitted pursuant to this court's dispositive motion procedure, they will be the subject of a subsequent opinion.

4. Because in deciding a motion to dismiss the factual allegations of the plaintiff must be taken as true, *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1921 n. 3, 64 L.Ed.2d 572 (1980), the facts are taken from the Amended Complaint.

and related products. Amended Complaint at 9. In addition, agents and employees of Exxon allegedly continuously harassed Glenside by claiming that its repair and towing services "constituted a decline in retail performance, a nuisance and a failure of [Glenside] to maintain clean and healthful facilities, and that a continuation of said automotive repair and towing service constituted a strain in the franchise relationship and [Glenside] would be deemed uncooperative in said franchise relationship to its detriment." Amended Complaint at 9–10.

Glenside also alleges Exxon agents and employees repeatedly misrepresented to Glenside's employees that the franchise relationship would end because the landowner refused to renew the lease or sell the Service Station property to Exxon and that they should therefore seek other employment. Amended Complaint at 10–11. Glenside contends that, in fact, Exxon "was ultimately successful in its attempts to purchase said premises and did, indeed, purchase said premises from the landowner or its heirs, successors and assigns." Amended Complaint at 8.

Finally, Glenside alleges the Sales Agreement obliged Exxon to provide Glenside "with only those goods, inventory and services necessary to adequately, properly and successfully operate a retail motor fuel station operation...." Amended Complaint at 14. Glenside alleges it purchased inventory based on the representations of Exxon's "business counselors" that such inventory was marketable and essential to successful performance, when in fact much of the inventory remained "unsold, unmarketable and otherwise inappropriate for [Glenside's] retail motor fuel service station operation." Amended Complaint at 15.

Glenside alleges that prior to October 1989, it was a "longstanding" practice between Glenside and Exxon for Glenside to pay its monthly rental fees to the Exxon sales representative who regularly visited the Service Station. Amended Complaint at 3. Glenside alleges the sales representative did not make his customary visits in October and November 1989, and did not provide Glenside with the address to which rental payments should be mailed. *Id.* Glenside alleges it was for that reason that it failed to make its rental payments for these months. *Id.*

Glenside also states that while Lee[5] never "seriously threatened personal injury or damage to anyone associated with Exxon or Exxon's property," he had a long-standing argumentative relationship with an Exxon sales representative arising out of ongoing problems in obtaining gas supplies from Exxon. *Id.* Glenside acknowledges "these ongoing problems did contribute to one inappropriately emotional outburst during a telephone conversation with the secretary to [Exxon's] retail district manager. However [Lee] has since apologized for that isolated incident." *Id.*

On or around 4 January 1990, Glenside received notice from Exxon of Exxon's intention to terminate and not renew the Franchise Agreement effective 15 April 1990. Amended Complaint at 2. Glenside states Exxon claimed it was basing its decision to terminate on Glenside's failure to make timely rental payments for October and November 1989 and on Lee's alleged threat to cause damage to Exxon's property and injury to its personnel. Amended Complaint at 2–3.

On 3 April 1990, Glenside filed its Complaint for Preliminary and Permanent Injunction, seeking to enjoin Exxon from terminating the Franchise Agreement. *See* Complaint for Preliminary and Permanent Injunction (the "Complaint").

On 30 April 1990, Exxon answered the Complaint and asserted three counterclaims against Glenside. *See* Answer and Counterclaim. In Count I (the "First Counterclaim"), Exxon alleges the failure of Glenside to make timely rental payments for the months September 1988 and April, October and November 1989 and threats by Glenside against Exxon's personnel and

---

5. Glenside does not specifically refer to Lee in these allegations, but refers to the plaintiff as "he" and describes Lee as the "alter ego of plaintiff." Amended Complaint at 5. It is therefore presumed that these allegations refer to conduct by Lee.

property constitute grounds for termination and nonrenewal pursuant to 15 U.S.C. §§ 2802(b)(2)(A), 2802(b)(2)(B) and/or 2802(b)(2)(C) and 2802(c)(8).[6] In Count II (the "Second Counterclaim"), Exxon alleges it will be entitled to possess the Service Station on 15 June 1990. In Count III (the "Third Counterclaim"), Exxon alleges Glenside owes Exxon in excess of $3,500 for rent and other items. Exxon seeks declaratory relief that its termination and nonrenewal of the Franchise Agreement were lawful under the PMPA, injunctive relief enjoining Glenside from continuing to occupy and refusing to vacate the Service Station, a judgment against Glenside for the amounts due and owing, and legal costs and attorneys' fees.

Glenside filed its Answer to Counterclaim on 22 June 1990. It filed an Amended Answer to Counterclaim on 10 August 1990 (the "Amended Answer"). In the Amended Answer, Glenside asserted two affirmative defenses to Exxon's counterclaims. As its first affirmative defense (the "First Affirmative Defense"), Glenside alleges Exxon was a fiduciary to Glenside and exerted undue influence over Glenside to induce it to purchase inventory, change and restructure business activities and relationships and otherwise conduct business in a manner to which Glenside would not otherwise have consented. Glenside alleges: "As a result of said undue influence, [Glenside] was and is forced into an unnatural transaction that unfairly enriches [Exxon] at the expense of [Glenside]." Amended Answer at 5. As its second affirmative defense (the "Second Affirmative Defense"), Glenside alleges it is entitled to cure its alleged deficient performance of the terms of the Franchise Agreement, stating:

[Glenside], as incapacitated party, now has the election to ratify its prior promise by remedying said alleged "deficient" performance or avoiding enforcement of its contractual obligations. Plaintiff herein affirmatively elects to ratify its prior promise by remedying its "deficient" performance, and indeed, has already corrected said alleged "deficient" performance, in good faith, which remedied performance does not rise to the level of reasonable or material significance to

6. Section 2802 provides in relevant part:

**Franchise Relationship**

**General prohibition against termination or nonrenewal**

(a) Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise ... prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship....

**Precondition and grounds for termination and nonrenewal**

(b)(1) Any franchisor may terminate any franchise ... or may fail to renew any franchise relationship, if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship....

(B) A failure of the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions....

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable....

**Definition**

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

\*    \*    \*    \*    \*    \*

(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled....

15 U.S.C. § 2802.

the franchise relationship as contemplated by [the PMPA], amount to a failure to exercise good faith efforts, to carry out the provisions of said franchise relationship or constitute events which are relevant to the franchise permitting reasonable termination pursuant to [the PMPA].

Amended Answer at 6–7.

On 31 May 1990, Glenside withdrew its request for a preliminary injunction. It filed the Amended Complaint, which is the subject of the instant motion to dismiss, on 10 August 1990. *See* Amended Complaint.

The Amended Complaint contains twelve counts. Count One alleges Exxon seeks to terminate the Franchise Agreement with Glenside in violation of the PMPA, 15 U.S.C. § 2802. Count Two alleges Exxon seeks to terminate the Franchise Agreement for an improper motive, in order to operate the retail service station directly without reliance on a franchise arrangement. In Count Three, Glenside complains that agents and employees of Exxon continuously harassed Glenside by insisting that it abandon its automotive repair and towing services. In Count Four, Glenside complains that its employees were continuously harassed by Exxon's employees and agents, who misrepresented to them that they should seek other employment because Exxon may be unable to renew the lease or to purchase the Service Station property. Count Five incorporates the allegations of the prior four counts and states Exxon engaged in such conduct with malice. In Count Six, Glenside alleges Exxon seeks to terminate the Franchise Agreement for an improper motive in order to prevent Glenside from assigning the Franchise Agreement to a third party or to forestall the necessity of exercising its right of first refusal in the event Glenside sought to assign such agreement. In Count Seven, Glenside alleges Exxon's "business counselors" were negligent in the advice they gave Glenside as to what inventory to purchase. Count Eight alleg-

es Exxon breached an implied covenant to uphold its image with the public by virtue of highly publicized oil spills with which Exxon was associated. In Count Nine, Glenside alleges Exxon promised a reduction in Glenside's monthly rent in consideration for a reduction in Glenside's retail motor fuel prices and that Glenside suffered harm from the reduction made in its retail motor fuel prices. In Count Ten, Glenside alleges Exxon's "business counselors" represented to Glenside Exxon would make a reduction in Glenside's monthly rent in consideration for a reduction in Glenside's retail motor fuel prices in reckless disregard of the truth. In Count Eleven, Glenside demands an accounting of monies owing and credits due between Glenside and Exxon. Finally, in Count Twelve, Glenside alleges it suffered severe emotional distress as a result of the extreme and outrageous conduct of Exxon in divulging details of "[Glenside's] business and finances, franchise relationship with defendant and personal life," Amended Complaint at 22, to an individual who approached Lee in late 1987 with an offer to purchase assignment of Glenside's franchise.

Exxon filed its Answer to Amended Complaint and Counterclaims on 31 August 1990. The counterclaims asserted therein reiterate the counterclaims asserted in the Answer and Counterclaim filed 30 April 1990. In addition, on 28 December 1990, with the consent of Glenside, Exxon supplemented its counterclaims to allege in Count One Glenside failed to make timely payment of rent for the months August, September, October, November and December 1990.

Exxon now moves to dismiss Counts Two, Five, Six, Eight, Eleven and Twelve of the Amended Complaint.[7] Exxon also moves to strike the affirmative defenses of Glenside. For the reasons which follow, Exxon's motions are granted in part and denied in part.

---

**7.** Glenside "consents to the dismissal of Count Eleven of its Amended Complaint." Opposition at 45. Accordingly, Count Eleven is dismissed.

*Discussion*

## A. Standard of Review

A court may dismiss a complaint for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990); *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988). In deciding such a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Gomez*, 446 U.S. at 636 n. 3, 100 S.Ct. at 1921 n. 3; *Markowitz*, 906 F.2d at 103; *Melikian v. Corradetti*, 791 F.2d 274, 277 (3d Cir.1986); *Robb v. Philadelphia*, 733 F.2d 286, 290 (3d Cir.1984).

## B. The Statutory Scheme of the PMPA

Congress enacted the PMPA in 1978 "in recognition of the 'disparity of bargaining power which exists between the franchisor and the franchisee' in the gasoline industry." *Rodgers v. Sun Refining and Marketing Co.*, 772 F.2d 1154, 1158 (3d Cir. 1985) (quoting *Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670, 672 (3d Cir.1984)). Congress recognized franchisors "risk losing completely the return from their prior investments, and potentially their livelihood, if their franchise agreements are terminated," and that franchisors "used their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes." *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 587 (3d Cir.1989) (citing *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir.1987)). The PMPA was intended to protect franchisees from exploitation by large petrole-

um companies. *O'Shea*, 886 F.2d at 587 (citing S.Rep. 731, 95th Cong.2d Sess. 17–18, *reprinted in* 1978 U.S.Code & Admin. News, 873, 875–77).

The PMPA accomplishes this purpose primarily by limiting the grounds on which distributors may terminate or fail to renew the franchise. 15 U.S.C. § 2802.[8] Other than as provided therein, the PMPA makes it illegal for a franchisor to terminate or to refuse to renew a franchise. 15 U.S.C. § 2803(a). As exceptions to this general rule, the PMPA provides two grounds on which a franchisor may terminate or fail to renew a franchise due to failure to perform on the part of the franchisee.[9] First, the franchisor may terminate or fail to renew a franchise when the franchisee fails to "comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). Second, the franchisor may terminate or fail to renew a franchise for the franchisee's failure to make a good faith effort to carry out any provision of the contract "without consideration of the reasonableness of the term as long as the franchisee is given an opportunity to comply with the term in question." *O'Shea*, 886 F.2d at 595 (citing *Mobil Oil Corp. v. Karbowski*, 879 F.2d 1052, 1054 (2d Cir. 1989)); 15 U.S.C. § 2802(b)(2)(B).

The Third Circuit has recently limited the instances in which subsection (b)(2)(B) will justify a termination:

> Although section 2802(b)(2)(B) does not explicitly state a materiality requirement, we nonetheless believe that a franchisor could not justify terminating a franchisee pursuant to the section for failing to exercise good faith in carrying out immaterial provisions of the franchise agreement. Congress clearly stated its purpose to prevent "arbitrary or discriminatory" terminations. Senate Report at 15, 1978 U.S.Code Cong. & Admin.News,

---

**8.** *See supra* at 1105 n. 6.

**9.** The PMPA also makes termination or nonrenewal of a franchise relationship permissible for business reasons specified in the statute, or

upon the agreement of the franchisee and franchisor. *See* 15 U.S.C. § 2802. Because these grounds for termination are not relied upon by Exxon, they are not relevant to the instant case and are not discussed.

874. If franchisors could terminate franchisees when they fail to comply with immaterial terms, this purpose would be frustrated, because, by definition, a franchisor can have no legitimate reason to terminate a franchise for violating immaterial contract provisions.

*O'Shea*, 886 F.2d at 595 n. 11.

In addition, in construing whether the franchisee has failed to perform the terms of the franchise agreement in the sense intended by either subsection (b)(2)(A) or (b)(2)(B), reference must be made to 15 U.S.C. § 2801(13), in which "failure" is defined. *Sun Refining & Marketing Co. v. Rago*, 741 F.2d 670, 673 (3d Cir.1984). Under this subsection, the term "failure" does not include:

(A) any failure which is only technical or unimportant to the franchise relationship; or

(B) any failure for a cause beyond the reasonable control of the franchisee.

15 U.S.C. § 2801(13).

Finally, termination or nonrenewal of a franchise agreement is permitted upon "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable...." 15 U.S.C. § 2802(b)(2)(C). The PMPA provides a nonexhaustive list of examples of such occurrences, including fraud or criminal conduct by the franchisee "relevant to the operation of the marketing premises" and failure by the franchisee to make timely payment of sums owing to the franchisor. 15 U.S.C. §§ 2802(c)(1), 2802(c)(8).[10]

In order to further the purposes of the PMPA, Congress "thought it important that there be a clear, uniform definition of the rights of franchisors and franchisees with respect to 'the crucial area of termination of a franchise.'" *O'Shea*, 886 F.2d at 588 (quoting S.Rep. 731, 1978 U.S.Code Cong. & Admin.News at 876–878). Thus, section 2806 preempts state law relating to the termination or nonrenewal of franchise relationships "unless such provision of such law or regulation is the same as the applicable provision of this chapter." 15 U.S.C. § 2806[11] This section preempts both statutory and common law involving wrongful franchise terminations. *Graeber v. Mobil Oil Corp.*, 614 F.Supp. 268, 270 (D.N.J.1985). *See, e.g., Di Napoli v. Exxon Corp.*, 549 F.Supp. 449, 455 (D.N.J. 1982); *Meyer v. Amerada Hess Corp.*, 541 F.Supp. 321, 332 (D.N.J.1982).

With these purposes and principles of the PMPA in mind, Exxon's motion to dismiss and to strike affirmative defenses is considered as to each count of the Amended Complaint and as to each affirmative defense.

### C. Counts Two and Six

In Count One, Glenside alleges Exxon seeks to terminate the franchise in violation of the PMPA. Counts Two and Six elaborate upon Count One. Count Two alleges: "[Exxon] now seeks termination of said franchise relationship solely for reason of its ownership of said real estate and ability to now operate said premises as a direct retail service station operation with-

---

**10.** On 7 February 1991, Lee was convicted by the New Jersey Superior Court, Essex County, of third degree aggravated assault, unlawful possession of a weapon and possession of a weapon for unlawful purpose. Exxon has since filed a motion for emergency injunctive relief enjoining Glenside and Lee from continuing to occupy the Service Station. Exxon also moved for leave to supplement its counterclaims to state claims against Glenside based upon Lee's convictions. These motions are pending and will be the subject of a subsequent opinion.

**11.** Section 2806 provides in relevant part:
   **Relationship of statutory provisions to State and local laws**

(a) To the extent that any provision of this subchapter applies to the termination ... of any franchise, or to the nonrenewal ... of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation ... with respect to termination ... of any such franchise or to the nonrenewal ... of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this chapter.

15 U.S.C. § 2806(a).

out necessity of further or future franchise agreements with [Glenside] or others." Amended Complaint at 8. Count Six alleges:

6. Upon information and belief, defendant seeks termination of said franchise relationship solely to avoid assignment of said franchise relationship to a third party as is permitted pursuant to 15 U.S.C. § 2801 et seq.

7. Upon information and belief, defendant seeks termination of said franchise relationship solely to avoid the necessity of exercising its right of first refusal and, accordingly, the necessity of paying good and valuable consideration for release of its contractual obligations pursuant to said franchise relationship to either [Glenside] or a third party.

Amended Complaint at 13–14.

Exxon claims in the First Counterclaim that termination was proper under subsections (b)(2)(A), (b)(2)(B) and/or (b)(2)(C) of the PMPA due to Glenside's threats to injure Exxon's personnel and property and due to its failure to make timely rental payments. *See* Answer and Counterclaim. In support of its motion to dismiss these counts, Exxon argues Counts Two and Six fail to state a claim because any ulterior motive it might have had to terminate the Franchise Agreement is irrelevant to a wrongful termination claim by a franchisee under the PMPA when, as here, the termination is made for an improper act of the franchisee. Motion to Dismiss Brief at 5.

■ Section 2805 provides an enforcement mechanism for franchisees to sue franchisors for wrongful termination. *See* 15 U.S.C. § 2805(a). Subsection 2805(c) establishes the burdens of the parties in an action brought pursuant to subsection 2805(a):

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with

evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title....

15 U.S.C. § 2805. Thus, all a plaintiff need do is make out a *prima facie* case of a violation of the PMPA concerning termination of the franchise agreement and the burden then shifts to the franchisor to demonstrate the termination or nonrenewal was proper. *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 720 (7th Cir.1985); *Thompson v. Kerr–McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982).

It appears only a few courts have considered whether the bad faith or motive of the franchisor has any bearing on the propriety of the termination or nonrenewal when the termination or nonrenewal is based on conduct by the franchisee. The courts which have considered the question have found assertions as to improper motive or bad faith by the franchisor to be irrelevant in evaluating the propriety of the termination or nonrenewal where the termination or nonrenewal is based on conduct by the franchisee. *See Smoot v. Mobil Oil Corp.*, 722 F.Supp. 849, 857 (D.Mass.1989); *Doebereiner v. Sohio Oil Co.*, 683 F.Supp. 791, 795 (S.D.Fla.1988), *aff'd*, 880 F.2d 329 (11th Cir.1989); *Crown Central Petroleum Corp. v. Waldman*, 515 F.Supp. 477, 485 (M.D.Pa.1981) (*"Crown Central"*), *aff'd without op.*, 676 F.2d 684 (3d Cir.1982).

In *Smoot*, the court was faced with a wrongful termination action in which the termination was based on PMPA subsection (b)(2)(B). The court considered the assertion by the franchisee that the franchisor terminated the franchise in bad faith. In deciding what weight to accord the franchisee's assertion, the court reviewed the statutory scheme of the PMPA and observed it required good faith conduct by the employer in four specific contexts, none of which were present in the case before it.[12] The court then stated:

**12.** These contexts were: termination due to withdrawal from the marketing territory pursuant to § 2802(b)(2)(E); termination due to a

failure to agree on changes or additions to franchise agreements pursuant to § 2802(b)(3)(A)(i); termination for economic reasons related to the

[T]he language of the PMPA demonstrates that Congress was aware that it might be desirable to impose a duty of good faith in certain areas and knew how to require it expressly when it deemed such a duty appropriate. " 'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States*, 464 U.S. 16, 23 [104 S.Ct. 296, 300, 78 L.Ed.2d 17] (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)).

*Smoot*, 722 F.Supp. at 857. The court inferred from this principle: "This presumption and the disparate language of the PMPA indicate that in this case the court may not properly imply a duty of good faith in addition to the express requirements of § 2802(b)(2)." *Id.* (citation omitted). It then concluded evidence of motive for the termination was irrelevant to the action. *Id.*

In *Crown Central*, the franchisee claimed the franchisor was relying on the PMPA as justifying its decision to terminate the franchise "as a subterfuge for its true desire to take over a profitable, independently operated service station." *Crown Central*, 515 F.Supp. at 485. The court found the evidence of improper motive on the part of the franchisor was weak. In addition, the court accorded the assertion of improper motive no weight, holding:

> More important than the establishment of Crown's bad faith is its relevance to Crown's termination of Waldman's franchise relationship. Good faith is expressly made a condition for termination in only two subsections of the PMPA, neither of which has been advanced by Crown....
>
> The good faith condition was intended to avoid sham decisions by a franchisor to justify discontinuing a franchise relationship. When termination is predicated

on actions by the franchisee, and not by the franchisor, the need to avoid sham justifications for the franchisor's decisions to terminate the franchise is drastically reduced. The franchisee's conduct can be objectively measured against the requirements of 15 U.S.C. § 2802(b)(2). Once a franchisee accepts the legal and contractual obligations of the franchise agreement, he is not free to disregard them. The PMPA does not command or authorize scrutiny of Crown's motives in seeking termination for Waldman's breach of the Agreement.

*Crown Central*, 515 F.Supp. at 485 (citation omitted). *See also, Doebereiner*, 683 F.Supp. at 795 (in assessing the merit of claim by franchisee that franchisor terminated the franchise in order to take over a profitable location, the court stated "[the franchisor's] future plans for the station are less relevant than [the franchisee] would have the court believe.") (citing *Crown Central*, 515 F.Supp. at 485).

In the instant case, Glenside has stated a cause of action for wrongful termination in Count One, where it alleged the termination was improper under the terms of the PMPA. To the extent Glenside prevails on Count One, Glenside may be entitled to raise motive or bad faith to show it is entitled to punitive damages because Exxon's conduct was "in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder...." 15 U.S.C. § 2805(d)(1)(B).

As noted above, the courts which have considered the question have ruled the PMPA imposes no duty of good faith on franchisors in terminations based on conduct by the franchisee, as Exxon asserts occurred in the instant case. Glenside has pointed to no authority holding otherwise, and it does not appear such authority exists. Glenside has failed to state a cause of action in Counts Two and Six.

Accordingly, Counts Two and Six are dismissed.

---

site itself pursuant to § 2802(b)(3)(D); and termination due to the franchisor's loss of the right

to grant the use of its trademark pursuant to § 2802(c)(6). *See Smoot,* 722 F.Supp. at 856.

## D. Count Five

In Count Five, Glenside incorporates Counts One through Four and alleges the conduct by Exxon described therein "was malicious, with the intended purpose of harming plaintiff, its business and good will." Amended Complaint at 12. As stated previously, Count One alleges the termination violated the PMPA, Count Two, which has been dismissed, alleges an improper motive for the termination, Count Three alleges Exxon harassed and injured Glenside by insisting Glenside abandon its automotive repair and towing services, and Count Four alleges Exxon harassed and injured Glenside by misrepresenting to Glenside's employees that the Franchise Agreement may not be renewed because Exxon might lose access to the Service Station property. Amended Complaint at 1–10.

Exxon argues for dismissal on the grounds that Count Five states conclusory allegations that the conduct of Exxon was malicious and therefore fails to meet the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). In addition, Glenside characterizes Count Five as asserting liability by Exxon solely for "malicious" conduct, without alleging how the conduct otherwise violated the law. Motion to Dismiss Brief at 7–9. Exxon asserts there is no independent cause of action in New Jersey for "malicious" conduct. Motion to Dismiss Brief at 7 (citing *O'Connor v. Harms*, 111 N.J.Super. 22, 266 A.2d 605 (App.Div.), *cert. denied*, 57 N.J. 137, 270 A.2d 40 (1970); *Barber v. Hohl*, 40 N.J.Super. 526, 123 A.2d 785 (App.Div.1956)).

Counsel for Glenside conceded at oral argument held on 14 January 1990 that Count Five is intended to incorporate the factual allegations of Counts One through Four and to request punitive damages. It was conceded Count Five does not set forth a separate cause of action. Therefore, Count Five is stricken as redundant of Counts One through Four. *See Tradewinds, Inc. v. Citibank*, 7–1980, Slip Op. at Lexis 7–8 (D.V.I. 30 December 1980) (citing *OKC Corp. v. Williams*, 461 F.Supp. 540

(N.D.Tex.1978); *Rechsteiner v. Madison Fund, Inc.*, 75 F.R.D. 499 (D.Del.1977).

## E. Count Eight

■ In Count Eight, Glenside asserts Exxon is liable to Glenside for well-publicized oil spills with which Exxon was associated. Glenside asserts these oil spills violated Exxon's obligation, derived from what Glenside asserts are implied terms of the Franchise Agreement, to uphold the public's confidence in Exxon's name and image.

In making this claim for breach of an implied contractual term, Glenside relies on paragraph 14 of the Sales Agreement ("Paragraph 14"), which provides:

14. *RETAIL PERFORMANCE:* The Exxon trademark signifies a commitment by Exxon and its independent dealers to offer to the motoring public only high quality automotive products and excellent and distinguished customer service. To preserve and continue the public's confidence in Exxon's products and the service of its independent dealers and to maintain and enhance Exxon's established good will and superior image with the motoring public, the Buyer agrees to the following levels of performance:

(a) Customer Service—to assist in maintaining a high level of customer acceptance of Exxon's trademarked products by keeping the premises open for dispensing of products associated with such trademarks during such hours each day and days each week as are reasonable. Reasonable hours and days shall be determined considering customer convenience, the hours and days of Buyer's competitors in the same trading area, other competitive conditions and economic consequences to Buyer. Reasonable hours of operation may be specifically agreed upon by Buyer and Seller and set forth in a separate lease agreement.

(b) Customer Relations—in operating the premises, to render appropriate, prompt, efficient, courteous service to Buyer's customers, to respond expeditiously to all complaints of such customers, making fair adjustments when appropriate, and

to otherwise conduct Buyer's business in a fair and ethical manner;

(c) Clean and Healthful Facilities—to keep the premises in a good state of repair, to maintain in a clean and healthful manner and to keep the restrooms clean, orderly, sanitary and adequately furnished with restroom supplies, all in reasonable conformity with appearance and image guidelines as may be provided to the Buyer by Exxon during the term of this agreement; and

(d) Attendants—to provide a sufficient number of qualified, neatly dressed and appropriately uniformed attendants to render first-class service to customers.

Complaint at 16; Sales Agreement, ¶ 14, attached as Exhibit B to Answer to Amended Complaint and Counterclaims.

Glenside argues: "Implied in the paragraph as above [Paragraph 14] is that defendant, too, would 'preserve and continue the public's confidence in Exxon's products and the service of its independent dealers' and would further maintain and enhance Exxon's established good will and superior image with the motoring public." Complaint at 17. It alleges Exxon failed to uphold its image when it was "negligent, careless and reckless in causing or allowing to occur several certain, highly-publicized oil spills...." *Id.* Glenside alleges it was financially harmed because of boycotts and other sanctions imposed by the public in response to "defendant's acts and omissions". *Id.*

Paragraph 14 does not refer to any obligation of Exxon to uphold its image with the public, or to refrain from involvement in oil spills. Therefore, if it so binds Exxon it does so as a result of an implied contractual obligation.

■ Under New Jersey law, a contractual term will be implied by a court where " 'the parties must have intended them because they are necessary to give business efficacy to the contract as written.' " *Onderdonk v. Presbyterian Homes of New Jersey,* 85 N.J. 171, 182, 425 A.2d 1057 (1981) (quoting *New Jersey Bank v. Palladino,* 77 N.J. 33, 46, 389 A.2d 454 (1978)). In addition, terms may be implied because

they are necessary " 'to give the contract the effect which the parties, as fair and reasonable [people], presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference to.' " *Mazzeo v. Kartman,* 234 N.J.Super. 223, 231, 560 A.2d 733 (App.Div.1989) (quoting *William Berland Realty Co. v. Hahne & Co.,* 26 N.J.Super. 477, 487, 98 A.2d 124 (Ch.Div.1953), *modified,* 29 N.J. Super. 316, 102 A.2d 686 (App.Div.1954)). *See also Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965); *Barco Urban Renewal Corp. v. Housing Authority of Atlantic City,* 674 F.2d 1001, 1007 (3d Cir.1982).

Paragraph 14 characterizes the trademark of Exxon as signifying a "commitment" to offer high quality products and service, and states the franchisee must do its duty to preserve the reputation of the trademark by performing the duties enumerated therein. It thus unambiguously binds the franchisee to performing certain duties, not Exxon. Glenside asserts it "could reasonably have intended that, in return for his own agreement to uphold Exxon's trademarks, Exxon would at least do likewise." Opposition at 26. Significantly, Glenside does not contend Exxon has offered anything other than high quality products or service.

The obligation which Glenside says in Count Eight is extant will not be implied from the language of Paragraph 14. Such a reading of the Sales Agreement is not supported by the language of Paragraph 14, is unnecessary in order to give business efficacy to the Franchise Agreement and would not have been intended by the Parties "as fair and reasonable people" had they foreseen the eventuality of the oil spills prior to entering into the Franchise Agreement. The imposition of such an obligation on Exxon to "uphold" public confidence in its trademark would render Exxon liable for any conduct which adversely affected its reputation, regardless of whether such conduct was preventable and regardless of whether it could have foreseen how such conduct would register with public

opinion. Such a reading would make Exxon liable for any conduct and for all foreseeable and unforeseeable effects of its conduct resulting in a tarnished corporate image. Such liability will not be implied in the absence of evidence supporting such an interpretation of the Franchise Agreement, and in the absence of any need to do so to give business efficacy to the Franchise Agreement.

Count Eight is dismissed for failure to state a claim.

### F. Count Twelve

■ Count Twelve alleges the "plaintiff" suffered "severe emotional distress" upon being approached by an individual who offered to purchase the franchise for $20,000 and who had "much, varied, intimate and detailed knowledge and awareness of plaintiff's business and finances, franchise relationship with defendant and personal life," which this individual attributed to Exxon's District Manager, A.J. Luciano. Complaint at 21–22. Glenside claims "[s]aid disclosure to another individual by [Exxon's] agent, servant and employee amounts to extreme and outrageous conduct, misuses of authority and extreme business conduct transcending all bounds of decency." Complaint at 22.

In response to Exxon's assertion that a corporation cannot suffer emotional distress, Glenside concedes that Count Twelve states no cause of action as to emotional distress suffered by Glenside. Opposition at 33 ("Glenside does not dispute Exxon's contention that a corporation cannot, for obvious reasons, maintain a cause of action sounding in emotional distress."). Glenside requests that the court grant leave to amend the Amended Complaint so as to include Lee, the owner of Glenside, as plaintiff and so as to allege a claim of emotional distress suffered by Lee. Opposition at 33. In the alternative, Glenside requests that the court deem Count Twelve as alleging Lee suffered emotional distress by deeming Lee to be the "alter ego" of Glenside. In response to this argument, Exxon asserts that even if Lee is substituted for Glenside in Count Twelve, the allegations contained therein do not state a cause of action for the intentional infliction of emotional distress. Reply at 14–15.

■ Count Twelve does not state whether it alleges the intentional or the negligent infliction of emotional distress. With respect to claims for the intentional infliction of emotional distress, New Jersey courts have adopted the definition of the *Restatement (Second) of Torts* § 46 (1965) for the intentional infliction of emotional distress. *Buckley v. Trenton Savings Fund Soc.*, 111 N.J. 355, 544 A.2d 857 (1988); *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981). Under this definition, the plaintiff must prove conduct by the defendant "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366, 544 A.2d 857 (quoting *Restatement (Second) of Torts* § 46, comment d). The act must have been done with the intent to do the act and to produce the emotional distress, or in deliberate disregard of a high degree of probability that emotional distress will follow. *Id.* The defendant's actions must have been the cause of the emotional distress, and the distress must be "so severe that no reasonable man could be expected to endure it." *Id.* (quoting *Restatement (Second) of Torts* § 46, comment j); *Hume*, 178 N.J.Super. at 317–319, 428 A.2d 966.

One New Jersey court has found conduct constituting the intentional infliction of emotional distress where a physician, knowing it to be false, told parents their son was suffering from cancer. *Hume*, 178 N.J.Super. at 310, 428 A.2d 966. A possible claim was also found where a hospital was unable to locate the body of a deceased baby for three weeks. *Muniz v. United Hospitals Medical Center Presbyterian Hospital*, 153 N.J.Super. 79, 379 A.2d 57 (App.Div.1977). Other examples of conduct rising to the level of outrageousness required to make out this claim include "spreading a false rumor that plaintiff's son had hung himself; bringing a mob to plaintiff's door with a threat to

lynch him if he did not leave town; and wrapping up a gory dead rat inside a loaf of bread for a sensitive person to open." *Hume,* 178 N.J.Super. at 315, 428 A.2d 966 (citing Prosser, *Law of Torts* § 12 at 50 (4th ed. 1971)). *See also Heywood v. Cruzan Motors, Inc.,* 792 F.2d 367, 371 (3d Cir.1986) (failure to honor express and implied terms of contract and conditions of sale in business relationship did not state claim for the intentional infliction of emotional distress).

■ With respect to the negligent infliction of emotional distress, the New Jersey supreme court has held that "where negligence causes fright from a reasonable fear of immediate personal injury," a plaintiff may recover damages for any resulting "substantial bodily injury or sickness." *Falzone v. Busch,* 45 N.J. 559, 569, 214 A.2d 12 (1965). However, "where fright does not cause *substantial* bodily injury or sickness, it is to be regarded as too lacking in seriousness and too speculative to warrant the imposition of liability." *Id.* (emphasis in original). In addition, a cause of action for the negligent infliction of emotional distress may not be maintained if the injury was not foreseeable:

> [I]n the case of injury or sickness brought on by emotional disturbance, liability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury, in a person normally constituted, thus bringing the plaintiff within the 'zone of risk.'

*Caputzal v. Lindsay Co.,* 48 N.J. 69, 76, 222 A.2d 513 (1966).

■ Glenside has conceded it has stated no cause of action in Count Twelve for emotional distress suffered by Glenside, a corporation. Even if Glenside were to be granted permission to amend the Amended Complaint so as to include Lee as plaintiff, the alleged conduct of Exxon does not rise to the level required to state a claim for the intentional or for the negligent infliction of

emotional distress. Taking as true Glenside's allegations that the individual who approached Lee with an offer to purchase the franchise knew intimate details of his personal and business life, that the individual had such knowledge because of divulgences made to him by an Exxon agent and that Lee suffered severe emotional distress as a result of learning of such divulgences, such allegations do not make out a claim against Exxon for the intentional or the negligent infliction of emotional distress. Such divulgences do not rise to the level of outrageousness and atrociousness which is "utterly intolerable in a civilized community." *Buckley,* 111 N.J. at 366, 544 A.2d 857. Moreover, it is not alleged Lee suffered such fright that he was caused substantial bodily injury or sickness and so cannot make out a claim for the negligent infliction of emotional distress. Neither Glenside nor Lee is entitled to relief for these asserted causes of action in Count Twelve, *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232, even if leave were granted to amend the Amended Complaint so as to add Lee as a plaintiff.

Accordingly, leave to amend Count Twelve is denied; Count Twelve is dismissed for failure to state a cause of action.

### G. The Motion to Strike the Affirmative Defenses

■ Exxon moves to strike Glenside's two affirmative defenses pursuant to Federal Rule of Civil Procedure 12(f).[13] Motions to strike an affirmative defense under Rule 12(f) are "not favored and will not be granted 'unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.' " *Durham Industries, Inc. v. North River Insurance Co.,* 482 F.Supp. 910, 913 (S.D.N.Y.1979). *See also United States v. Mari-*

---

**13.** Rule 12(f) provides:

**Motion to Strike.** Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed.R.Civ.P. 12(f).

*sol, Inc.*, 725 F.Supp. 833, 836 (M.D.Pa. 1989). Thus, a motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact. *Marisol, Inc.*, 725 F.Supp. at 836; *Linker v. Custom–Bilt Machinery, Inc.*, 594 F.Supp. 894, 898 (E.D.Pa.1984). Even where the facts are not in dispute, Rule 12(f) is not meant to afford an opportunity to determine disputed and substantial questions of law. *Heller Financial Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1295 (7th Cir. 1989); *Marisol, Inc.*, 725 F.Supp. at 837.

Motions to strike save time and expense, however, by making it unnecessary to litigate defenses which will not affect the outcome of the case. Motions to strike will therefore be granted when a defense is legally insufficient under any set of facts which may be inferred from the allegations of the pleading. *Heller Financial, Inc.*, 883 F.2d at 1294; *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 779 (11th Cir.1982); *United States v. Geppert Bros., Inc.*, 638 F.Supp. 996, 998 (E.D.Pa.1986); *Marisol, Inc.*, 725 F.Supp. at 836.

### 1. *First Affirmative Defense*

As to the First Affirmative Defense, Glenside alleges Exxon was in a "position of trust" as to Glenside and "enjoyed a dominant psychological position" over it. Glenside asserts: "[Exxon] had the opportunity and predisposition to exercise undue influence and did, indeed, utilize this dominant psychological position, relationship of trust and confidence and fiduciary relationship to unfairly persuade [Glenside] to enter the ... lease and ... sales agreement and concomitant transactions." Amended Answer at 4. Glenside adds: "[Glenside] was both susceptible to the careless, reckless and negligent business advices, misinformation and unfair business practices of [Exxon's] multiple and so entitled 'district managers' and 'business

counsellors,' and without reasonable access to independent advice." Amended Answer at 5. Glenside further states:

> 7. [Exxon and its agents and employees] used such position in an unfair manner to induce plaintiff to consent to purchase additional inventory ..., change and restructure business activities and relationships, and otherwise conduct business in a manner to which plaintiff would not ordinarily have so consented.

> 8. As a result of said undue influence, plaintiff was and is forced into an unnatural transaction that unfairly enriches defendant at the expense of the plaintiff.

Amended Answer at 5. Thus, it appears Glenside asserts a fiduciary relationship existed between the Parties, that by virtue of such relationship Glenside was susceptible to the exertion of undue influence over it by Exxon and that it was harmed from advice it was given by Exxon employees and agents.

In support of its motion to strike the First Affirmative Defense, Exxon argues a franchise relationship does not create a fiduciary relationship between the franchisor and franchisee under New Jersey law nor under the PMPA. Motion to Strike Brief at 7. In addition, Exxon argues the First Affirmative Defense is preempted by the PMPA.

It appears the courts which have considered whether the PMPA creates a fiduciary relationship between a franchisor and franchisee have found that it does not. *See Esquivel v. Exxon Co.*, 700 F.Supp. 890, 897 (W.D.Tex.1988) ("[T]he PMPA, through which the parties entered into their franchise relationship, 'does not create a fiduciary duty between the franchisor and the franchisee.'"); *Cason v. Texaco, Inc.*, 621 F.Supp. 1518, 1525 (M.D.La.1985). *Cf., Hill v. Texaco, Inc.*, 825 F.2d 333, 335 n. 2 (11th Cir.1987) (oil franchisee made no showing that fiduciary relationship existed with oil franchisor); *Total Petroleum, Inc. v. Davis*, 788 F.2d 476, 483–84 (8th Cir. 1986) (finding no fiduciary relationship under Missouri law governing relationship between oil franchisor and franchisee).

In addition, no fiduciary relationship exists between franchisor and franchisee under New Jersey law. *See Sandler v. Lawn–A–Mat Chemical & Equipment Corp.*, 141 N.J.Super. 437, 450–51, 358 A.2d 805 (App.Div.), *cert. denied*, 71 N.J. 503, 366 A.2d 658 (1976) (finding contract between franchisor and franchisee did not create a "special relationship or duty beyond that arising out of any commercial transaction"). *See also Newark Motor Inn Corp. v. Holiday Inns, Inc.*, 472 F.Supp. 1143, 1151–52 (D.N.J.1979) (no fiduciary obligations arise out of franchise contract; contract contains only an implied covenant of good faith and fair dealing which exists in all contracts).

Glenside concedes "it is well settled that a franchise relationship, without more, does not a fiduciary relationship make. Nor does the PMPA create, itself, a fiduciary relationship among the parties." Opposition at 37. Glenside asserts fiduciary obligations on the part of Exxon should be found, however, because no authority precludes finding such a relationship between a franchisor and franchisee or holds that such a fiduciary relationship can never arise. *Id.*

This argument is rejected. There is insufficient basis for implying fiduciary obligations into a contractual relationship such as a franchise agreement. Moreover, the weight of authority holds otherwise. Thus, Glenside cannot state a claim that Exxon exerted undue influence on it by virtue of its position of trust vis-a-vis Glenside and its dominant position. The First Affirmative Defense is stricken because it is insufficient on its face.

Glenside attempts to escape its framing of the First Affirmative Defense by arguing the First Affirmative Defense in fact raises two affirmative defenses, one for breach of fiduciary obligations and one for undue influence. Opposition at 37. However, the First Affirmative Defense unambiguously states a claim for a breach of fiduciary obligations by Exxon. *Cf. Arnott v. American Oil Co.*, 609 F.2d 873, 881 n. 7 (8th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272

(1980) ("A fiduciary relationship is one founded on trust or confidence placed by one person in the integrity and fidelity of another person. Out of such a relation, the law requires that neither party exert undue influence or pressure upon the other, take selfish advantage of his trust or deal with the subject matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of the other person involved."). This belated characterization of the First Affirmative Defense by counsel cannot save the First Affirmative Defense from being stricken.

Even if fiduciary obligations did exist under the PMPA or under New Jersey law, the First Affirmative Defense would be preempted by the PMPA insofar as it was raised as a defense to Exxon's counterclaim asserting proper termination under the PMPA. A state law-based claim is preempted if it relates to the "grounds for, procedures for, and notification requirements with respect to termination." *O'Shea*, 886 F.2d at 592 (quoting *Bellmore v. Mobile Oil Corp.*, 783 F.2d 300, 304 (2d Cir.1986)). However, the PMPA does not preempt all state law relating to any aspect of the termination or non-renewal of petroleum franchises. *Bellmore*, 783 F.2d at 304.

In *Bellmore*, the court considered whether a Connecticut statute requiring a franchisor to pay good will to a franchisee if it did not provide the franchisee with proper pre-termination notification was preempted. The court held it was not—the statute did not alter the notice provisions of the PMPA and it did not affect the franchisor's ability to terminate or not to renew the franchise relationship. *Id.* at 306.

A claim or defense is preempted, however, where it affects whether termination or nonrenewal was permitted. *See, e.g., Continental Enterprises, Inc. v. American Oil Co.*, 808 F.2d 24, 28 (8th Cir.1986) (franchisee's claim that franchisor wrongfully failed to renew agreement fell "squarely within the area covered by the PMPA" and was preempted); *Esquivel,*

700 F.Supp. at 897 (franchisees' claims for fraud and breach of fiduciary duties were preempted because they had "the obvious and direct effect of seeking to continue a relationship validly terminated under the PMPA"); *Serianni v. Gulf Oil Corp.*, 662 F.Supp. 1020, 1025 (E.D.Pa.1986) (Pennsylvania statute making it illegal to terminate a franchise for failure to meet sales quota was preempted); *Siecko v. Amerada Hess Corp.*, 569 F.Supp. 768, 772–73 (E.D.Pa. 1983) ("To the extent Pennsylvania common law [regarding fiduciary duties] would produce a different result in this case, it is of no effect"); *Di Napoli*, 549 F.Supp. at 455; *Meyer*, 541 F.Supp. at 332 (to the extent the New Jersey Franchise Practices Act or common law would produce a different result than proper termination under the PMPA, "they are of no effect.").

Accordingly, the First Affirmative Defense is stricken.

### 2. *The Second Affirmative Defense*

■ As to its Second Affirmative Defense, Glenside asserts it should be given the right to cure whatever deficiencies were present in its performance of the terms of the franchise agreement:

2. [Glenside], by reason of [Exxon's] prior carelessness, negligence, reckless, misrepresentations, undue influence and outrageous conduct, did lack capacity and was without volitional consent to renew its franchise relationship with defendant.

3. [Glenside] acting on compulsion of pressing need, did renew said franchise relationship with defendant.

\* \* \* \* \* \*

5. [Glenside], as incapacitated party, now has the election to ratify its prior promise by remedying said alleged "deficient" performance or avoiding enforcement of its contractual obligations.

6. [Glenside] herein affirmatively elects to ratify its prior promise by remedying its "deficient" performance, in good faith, which remedied performance does not rise to the level of reasonable or material significance to the franchise relationship as contemplated by 15 USC 2801 et seq, amount to a failure to exer-cise good faith efforts, to carry out the provisions of said franchise relationship or constitute events which are relevant to the franchise permitting reasonable termination pursuant to 15 USC 2801 et seq.

Amended Answer at 6–7.

Under the terms of section 2802(b)(2)(B), a franchisee must be given an opportunity to cure a deficiency in its performance of the franchise agreement before termination or nonrenewal of the franchise. *See* 15 U.S.C. § 2802(b)(2)(B); *O'Shea*, 886 F.2d at 594–96. However, no opportunity to cure is provided to the franchisee under terminations or nonrenewals effected pursuant to subsections (b)(2)(A) or (b)(2)(C). 15 U.S.C. §§ 2802(b)(2)(A), 2802(b)(2)(C); *O'Shea*, 886 F.2d at 595 ("Section 2802(b)(2)(A) allows for termination *without requiring a chance for cure* if a franchisee breaches a reasonable and material contractual term...") (emphasis added); *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 59 (2d Cir.1984) ("[W]e hold that terminations pursuant to 15 U.S.C. §§ 2802(b)(2)(A) and 2802(b)(2)(C) do not require a notice and opportunity to cure before notice of termination may be given."). *See also Shell Oil Co. v. Hillary Farmer Service Station, Inc.*, 739 F.Supp. 749, 753 (E.D.N.Y.1990); *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 508 n. 15 (E.D.Pa. 1982).

■ To the extent Exxon asserts in its counterclaims its decision to terminate was made pursuant to subsections (b)(2)(A) or (b)(2)(C), Glenside is not afforded by the PMPA an opportunity to cure any deficiencies in its performance of the Franchise Agreement. Moreover, to the extent such a right to cure exists under state law, Glenside's Second Affirmative Defense is preempted by the PMPA, as it would effect whether the termination was permissible. The Second Affirmative Defense is stricken to the extent it is raised in defense to Exxon's claim that termination was proper pursuant to subsections (b)(2)(A) and (b)(2)(C). However, Exxon also raises subsection (b)(2)(B) as a ground for termination. The Second Affirmative Defense is

**1118**

not stricken to the extent it is raised to defeat Exxon's claim that termination was proper pursuant to section 2802(b)(2)(B).

*Conclusion*

For the foregoing reasons, Counts Two, Five, Six, Eight, Eleven and Twelve are dismissed and the First Affirmative Defense stricken. The Second Affirmative Defense is stricken insofar as it is raised as a defense to Exxon's claim that termination of the Franchise Agreement was proper pursuant to 15 U.S.C. §§ 2802(b)(2)(A) and 2802(b)(2)(C).